IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| POLLARD BANKNOTE LIMITED PARTNERSHIP, | | |
| Plaintiff, | | |
| v. | | 1:10-cv-0621-WSD |
| SCIENTIFIC GAMES INTERNATIONAL, INC.; and SCIENTIFIC GAMES PRODUCTS (CANADA), | | |
| Defendants. | | |

## OPINION AND ORDER

This matter is before the Court on Defendants Scientific Games

International, Inc., and Scientific Games Products' (Canada) Motion to Dismiss

[43] Plaintiff Pollard Banknote Limited Partnership's First Amended Complaint.

## I.   BACKGROUND[1]

On March 3, 2010, Pollard Banknote Limited Partnership ("Pollard" or

"Plaintiff") initiated this action by filing a complaint ("Original Complaint")

against Scientific Games International, Inc. ("SG Int'l"), Scientific Games

Corporation, and Oberthur Gaming Technologies, Inc. ("Oberthur") (collectively

---

[1] The facts are set out in more detail in the Court's January 18, 2011, Order [40] on
Scientific Games motion to dismiss [17].

the "Original Defendants").  Plaintiff sought to enjoin the Original Defendants from asserting U.S. Patent No. 6,308,991, entitled "Printed Document Including Bar Code Authentication System," ("the '991 patent") against any competitor or customer in the keyless validation instant-win scratch ticket market.[2]  Plaintiff also asked the Court to declare the claims of the '991 patent invalid.

The United States Patent and Trademark Office issued the '991 patent to Oberthur on October 30, 2001.  According to Pollard, Scientific Games and Pollard jointly evaluated the validity of the '991 patent, by among other things, collecting and analyzing "prior art" and obtaining a legal opinion from Scientific Games' outside counsel, Michael McMurry.  McMurry opined that the '991 patent was invalid as obvious in light of the prior art.  Pollard alleged that after reviewing McMurry's opinion, Scientific Games concluded that the '991 patent was invalid. Scientific Games later acquired the '991 patent through its purchase of Oberthur in 2007.[3]

---

[2] The Original Complaint actually referred to the market as the "instant-win scratch ticket market."  (Original Compl. [1] ¶ 1.)  In the First Amended Complaint, Pollard now uses the phrase "keyless validation instant-win scratch ticket market." (First Amended Compl. [42] ¶ 1.)  For simplicity, the Court will use the term "keyless validation instant-win scratch ticket market."

[3] In the First Amended Complaint, Pollard alleges that SG Corp. acquired Oberthur and "dissolved" it into SG Canada.  (Id. ¶ 23.)

Pollard competes with Scientific Games in the manufacture and sale of keyless validation instant-win scratch tickets.  Pollard and Scientific Games print these tickets and sell them to state lotteries.  Plaintiff alleged that the Original Defendants forced several state lotteries to license the '991 patent, knowing that it was invalid.  Pollard claimed that several of its state-lottery customers entered into licenses with the Original Defendants, and, as a result, the licenses negatively impacted the price Pollard was able to charge for tickets it printed and sold to these state lotteries.  Plaintiff did not allege that Scientific Games threatened litigation against Plaintiff, any other keyless validation instant-win scratch ticket manufacturer, any state lottery, or any other person, to enforce rights under the '991 patent.

On January 18, 2011, the Court issued an order granting the Original Defendants' Motion to Dismiss the Original Complaint (the "January 11th Order") [40].  The January 11th Order characterized Pollard's bad-faith licensing claim as follows:

> 1. Scientific Games asserted its rights in the '991 patent in entering into its license agreement with certain of its lottery customers;
>
> 2. Scientific Games asserted its rights in the '991 patent knowing this patent was not enforceable;

> 3. The assertion of the '991 patent against Scientific Games lottery customers was in bad faith; and
>
> 4. Scientific Games has enforced the '991 patent by demanding that lotteries with whom Pollard is doing, or seeks to do, business, pay to Scientific Games a royalty for Pollard to practice the '991 patent and that Scientific Games has entered into contracts with various state lotteries to allow them to purchase from Pollard tickets practicing the '991 patent, requiring the lotteries to pay a royalty for tickets that practice the '991 patent.

(<u>Id.</u> at 15.)  The Court explained that Pollard's antitrust theory was unprecedented, including because Pollard did not allege that Scientific Games acted to enforce the '991 patent, such as through litigation or a specific threat of enforced action, against either Pollard, other keyless validation instant-win scratch ticket vendors, or state lotteries.  The Court concluded that the "the mere assertion of the '991 patent to obtain favorable pricing vis-á-vis vendors does not state a cause of action under the antitrust laws."  (<u>Id.</u> at 16.)

The Court also found that Pollard did not adequately allege the relevant product and geographic markets.  (<u>Id.</u> at 20-22.)  In the absence of adequately alleged relevant markets, Pollard did not sufficiently allege dominance of those markets, (<u>id.</u> at 23), and thus failed to allege harm to competition.  (<u>Id.</u> at 24-25.)  Although the Court found a claim had not been stated, Pollard was allowed to amend its antitrust claim.

The January 11th Order also addressed Pollard's declaratory judgment claim, in which Pollard requested the Court to declare the '991 patent invalid. The Court concluded that Pollard had not pled sufficient facts to establish declaratory judgment jurisdiction. (Id. at 30.) The Court held that Scientific Games' alleged relationships with the third-party state lotteries did not constitute a substantial controversy of sufficient immediacy and reality between Pollard and Scientific Games to allow declaratory judgment jurisdiction to be exercised. (Id.)

On February 15, 2011, Pollard filed its First Amended Complaint ("FAC") [42]. In the FAC, Pollard amended its allegations pertaining to Pollard's antitrust claim and named SG Int'l and Scientific Games Products (Canada) LLC ("SG Canada") as defendants in this action (collectively "Defendants" or "Scientific Games").[4] On March 4, 2011, Defendants moved to dismiss the FAC on the grounds that it did not state an antitrust claim and because there was an absence of declaratory judgment jurisdiction.

---

[4] The FAC does not name Scientific Games Corporation or Oberthur Gaming Technologies, Inc. as defendants. Pollard claims that SG Int'l is the entity with which Pollard competes in the sale of keyless validation instant-win scratch tickets and that SG Canada, an affiliate of SG Int'l "holds title to the '991 patent being enforced by SG Int'l." (FAC ¶¶ 4, 12.)

## II.    DISCUSSION

### A.    Standard on Motion to Dismiss

The law governing motions to dismiss pursuant to Rule 12(b)(6) is well-settled.  Dismissal of a complaint is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).  In considering a motion to dismiss, the Court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and considers the allegations in the complaint in the light most favorable to the plaintiff.  Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).  Ultimately, the complaint is required to contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).[5]

To state a plausible claim for relief, the plaintiff must plead factual content that "allows the Court to draw the reasonable inference that the defendant is liable

---

[5] The Supreme Court explicitly rejected its earlier formulation for the Rule 12(b)(6) pleading standard:  "'[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The Court decided that "this famous observation has earned its retirement."  Id. at 563.

for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

"Plausibility" requires more than a "sheer possibility that a defendant has acted

unlawfully," and a complaint that alleges facts that are "merely consistent with"

liability "stops short of the line between possibility and plausibility of 'entitlement

to relief.'"  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 557).

That is, the "well-pled allegations must nudge the claim across the line from

conceivable to plausible."  <u>Jacobs v. Tempur-Pedic Int'l, Inc.</u>, 626 F.3d 1327, 1333

(11th Cir. 2010).  To "nudge the claim across the line, the complaint must contain

more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  <u>Id.</u>  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice.  <u>Id.</u> (citing

<u>Ashcroft</u>, 129 S. Ct. at 1949).[6]

---

[6] Federal Rule of Civil Procedure 8(a)(2) requires the Plaintiff to state "a short and
plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.
Civ. P. 8(a)(2).  In <u>Twombly</u>, the Supreme Court recognized the liberal minimal
standards imposed by Federal Rule 8(a)(2) but also acknowledged that "[f]actual
allegations must be enough to raise a right to relief above the speculative
level . . . ."  <u>Twombly</u>, 550 U.S. at 555.

B.    Pollard's Antitrust Claim

1.    *Standing*

In its January 11th Order, the Court expressed its concern with Pollard's

antitrust claim, stating:

> If, as Pollard argues, all one needs is a claim of bad faith
> assertion of an invalid patent in a licensing agreement and some
> indirect adverse economic impact downstream from the person
> from whom a license is requested, the chilling impact on those
> asserting a patent would be inestimable, especially where, as
> here, the assertion is not made against Pollard but with whom
> Pollard seeks to contract.

(Jan. 11th Order at 19.)

"[P]rivate plaintiffs derive standing to sue for [antitrust] violations . . . via

Clayton Act sections 4 and 16."  Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d

1414, 1420 (11th Cir. 1990).  "To recover under these sections a private plaintiff

must show both the occurrence of an antitrust violation and the incurrence of an

antitrust injury."  Id.; see also In Town Hotels Ltd. v. Marriott Int'l, 246 F. Supp.

2d 469, 474 (S.D.W.Va. 2003) ("[E]ven when a plaintiff properly alleges a clear

antitrust violation, the plaintiff will nonetheless suffer dismissal if it does not

allege that it suffered an antitrust injury.") (citing Atlantic Richfield Co. v. USA

Petroleum Co., 495 U.S. 328, 334-35 (1990)). "In other words, a plaintiff must

show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is

the type of injury contemplated by the statute." Blue Tree Hotels Inv. Can., Ltd. v. Starwood Hotels & Resorts, Inc., 369 F.3d 212, 220 (2d Cir. 2004) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). "[T]he mere fact that certain conduct has an anticompetitive effect does not mean that a given plaintiff has suffered an antitrust injury, or that a given plaintiff is the appropriate party to seek recovery under the antitrust laws." 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 739-40 (3d Cir. 2004).

Defendants argue that the Court should dismiss the FAC because Plaintiff's alleged injury is too indirect to support antitrust standing. Defendants primarily rely on the Supreme Court's decision in Ill. Brick Co. v. Illinois, 431 U.S. 720 (1977). In Illinois Brick, the state of Illinois brought an antitrust price-fixing claim against a concrete block manufacturer. Id. at 720. The manufacturer sold the blocks to masonry subcontractors, who sold them to general contractors, who then sold them to end customers, such as the state of Illinois. Id. at 726. The state of Illinois alleged that each member of the supply chain passed on the increased costs to the subsequent purchaser, leaving the state of Illinois to bear the brunt of the alleged price-fixing scheme. Id.

The Court concluded that because the state of Illinois was an indirect purchaser, it did not have standing to bring an antitrust claim against the block

manufacturer.[7]  <u>Id.</u> at 728.  The Court explained that allowing such "pass on"

antitrust theories

> would add whole new dimensions of complexity to treble-
> damages suits and seriously undermine their effectiveness . . .
> potential plaintiffs at each level in the distribution chain are in a
> position to assert conflicting claims to a common fund the
> amount of the alleged overcharge by contending that the entire
> overcharge was absorbed at the particular level in the chain.

<u>Id.</u> at 737.

The FAC alleges that the state lotteries, not Pollard, pay to license the '991

patent.  (FAC ¶ 107 ("On information and belief, SG Int'l's contracts with [the

state lotteries] also require the state to pay royalties to SG Int'l for use of the '991

patent."), ¶¶ 74, 80, 85.)  Pollard does not allege that it pays directly to license the

'991 patent.  (<u>See</u> <u>id.</u> ¶¶ 70-86.)[8]  Pollard alleges that the New York state lottery

only required Pollard to compensate it for any royalties the lottery paid under its

license to Scientific Games. (<u>Id.</u> ¶ 33.)  Pollard has not alleged that any other state

lottery passes its costs onto Pollard in a similar manner.  Defendants argue that

because Pollard does not directly pay to license the '991 patent, it is an indirect

[7] The Court listed two exceptions to the general rule that indirect purchasers do not
have antitrust standing: (1) cases involving a preexisting cost-plus contract and (2)
where the customers owns or controls the direct purchase.  <u>Id.</u> at 735-36, n. 16.
[8] Pollard specifically alleges that under its license with Scientific Games to provide
tickets to the Connecticut state lottery, "[t]he Connecticut state lottery is
responsible for paying the royalties to SG Int'l."  (FAC ¶ 74.)  Pollard makes
similar allegations with respect to Ohio and Virginia.  (<u>Id.</u> ¶¶ 80, 85.)

purchaser under <u>Illinois Brick</u> and does not have standing to assert its antitrust claim.

Pollard notes that in <u>Illinois Brick</u> the state of Illinois did not compete in the market for concrete blocks.  (Def's Br. [46] at 17.)  Pollard contends that because it participates in the keyless validation instant-win scratch ticket market, <u>Illinois Brick</u> does not apply.  Plaintiff instead argues that the Court should evaluate its standing under the Supreme Court's decision in <u>Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519 (1983).

In <u>Associated Gen. Contractors</u>, two labor unions brought an antitrust claim against a contractor's association.  <u>Id.</u> at 520-21.  The unions alleged that the contractor's association coerced landowners and general contractors to hire non-unionized labor and that this coercion harmed the unions in the marketplace.  <u>Id.</u> at 521.  The Supreme Court concluded that the labor unions could not assert its antitrust claim because it did not suffer an antitrust injury.  <u>Id.</u> at 545.

The Court also considered several factors to determine whether the plaintiff had antitrust standing because it was "virtually impossible to announce a black-

letter rule that will dictate [whether standing exists] in every case."[9] Id. at 536.

These factors included:

> 1) the existence of a causal connection between the antitrust violation and the alleged injury;

> 2) the nature of plaintiff's alleged injury;

> 3) the directness or indirectness of the asserted injury and the related inquiry of whether the damages are speculative;

> 4) the potential for duplicative recovery or complex apportionment of damages; and finally,

> 5) the existence of a more direct victim of the alleged anti-competitive conduct.

Austin v. Blue Cross & Blue Shield, 903 F.2d 1385, 1388 (11th Cir. 1990) (citing

Associated Gen. Contractors, 459 U.S. at 536-45).

Pollard argues that because it directly participates in the keyless-validation

instant-win scratch ticket market, it has standing to pursue its antitrust claims under

Associated Gen. Contractors.[10]  The Court agrees that Pollard participates in the

---

[9] In Cargill, Inc. v. Monfort of Colo., Inc., the Supreme Court clarified that courts should consider whether the plaintiff suffered an antitrust injury as well as the factors discussed in Associated Gen. Contractors to determine whether a plaintiff has antitrust standing.  479 U.S. 104, 111 n. 6 (1986).

[10] Pollard also argues that "where a company sues its competitor for the illegitimate use of a patent against its customers, there is no question that the company has standing to sue."  (Pl's Opposition [46] at 18 (citing Hydril Co., v. Grant Prideco, LP, 474 F.3d 1344, 1350 (Fed. Cir. 2004).)  In Hydril, the majority did not address the issue of standing and did not apply either Illinois Brick or Assoc. Gen. Contractors.  The dissent, however, argued that "we should hold that

alleged market, but nonetheless concludes that it lacks antitrust standing under both <u>Illinois Brick</u> and <u>Associated Gen. Contractors</u>.[11]

Because the state lotteries pay to license the '991 patent, as opposed to Pollard, Pollard is an indirect customer under <u>Illinois Brick</u>.  As an indirect customer, Pollard lacks standing to assert its antitrust claim.  Pollard alleges that one state lottery, New York, requires Pollard to "rebate the price of the tickets by the same amount that the New York lottery pays to SG Int'l for licensing the '991 patent."  (FAC ¶ 99.)  This is precisely the type of "pass-on" allegation that the Supreme Court discussed in <u>Illinois Brick</u>.  431 U.S. at 737 ("overlapping recoveries are certain to result from [multiple lawsuits] unless the indirect purchaser is unable to establish any pass-on whatsoever."); Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation §161.02[3] (2d ed. 2011) ("as a matter of law an indirect purchaser from an antitrust violater . . . lacks standing to sue.").

---

Hydril does not have standing to bring a <u>Walker Process</u> antitrust claim with respect to the finished drill pipe market because it admittedly only competes with Grant Prideco in that market 'outside of the United States.'" <u>Id.</u> at 1354.  <u>Hydril</u> does not stand for the proposition that a competitor always has standing when suing on behalf of its customers.  Courts deciding questions of antitrust standing must consider the factors discussed in <u>Assoc. Gen. Contractors</u> and determine whether a plaintiff has antitrust standing.  <u>Cargill</u>, 479 U.S. at 110 n. 5.

[11] For the purposes of this analysis, the Court assumes that Pollard has suffered some antitrust injury.

The factors discussed in <u>Associated Gen. Contractors</u> also weigh against Pollard's antitrust standing.  The claimed antitrust injury relies on a theory that the state lotteries, which pay a royalty to Defendants, allegedly pass on the cost of the royalty to Pollard.  The alleged scheme requires the Court to consider the actions taken by Defendants as well as the actions taken by the numerous state lotteries, who are not parties to this action.  "The indirect nature of [Pollard's] injury claims squarely 'implicates the strong interests . . . in keeping the scope of complex antitrust trials within judicially manageable limits."  <u>Austin</u>, 903 F.2d at 1392-93 (citing <u>Associated Gen. Contractors</u>, 459 U.S. at 543).  The causal connection between Defendants' licensing activities and Pollard's injury is also speculative because Pollard fails to allege which state lotteries, other than New York, pass the increased costs on to Pollard.

The Court also believes that there is a significant possibility that Scientific Games could be subject to conflicting or duplicative recoveries.  The state lotteries who pay Defendants a royalty to practice the '991 patent may also seek to recover against Defendants.  If this happens, Defendants could be liable to both Pollard and the state lotteries based on the same alleged conduct.  <u>See Amey, Inc. v. Gulf Abstract & Tile, Inc.</u>, 758 F.2d 1486, 1497 (11th Cir. 1985) ("the Supreme Court's policy against granting standing where the possibility exists of duplicative

recovery by the indirectly injured plaintiff and the more directly injured person who has yet to sue . . . has long been a part of this circuit's and the former Fifth Circuit's target area test."). The state lotteries, as the direct victims, are better positioned to seek redress for Defendant's alleged antitrust violations. The balance of the Associated Gen. Contractor factors weighs against Pollard and the Court concludes that Pollard does not have standing to assert its antitrust claims.

While standing is not present here, the Court elects also to consider the viability of Plaintiff's antitrust claim.

### 2. Viability of Claim

A patent allows its holder to exclude others from practicing the patent and Noerr-Pennington immunity generally protects patent holders from antitrust liability when they bring lawsuits to enforce their patents. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 56 (1993). This immunity can also protect similar patent activities, such as sending cease-and-desist letters and giving notice to suspected infringers of potential patent infringement. Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 1000 (Fed. Cir. 2007).

Noerr-Pennington immunity does not protect against all patent-enforcement activities. "When a patent owner uses his patent rights not only as a shield to

15

protect his invention, but as a sword to eviscerate competition unfairly, that owner may be found to have abused the grant and may be liable for antitrust violations when sufficient market power in the relevant market is present." <u>Atari Games Corp. v. Nintendo of Am., Inc.</u>, 897 F.2d 1572, 1576 (Fed. Cir. 1990).  If a patent holder initiates a sham litigation, meaning that "'(1) the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;' and (2) the party bringing the allegedly baseless suit did so with a 'subjective motivation . . . to interfere directly with the business relationships of a competitor,'" then <u>Noerr-Pennington</u> does not protect the patent holder from antitrust liability.  <u>Andrx Pharms., Inc. v. Elan Corp.</u>, 421 F.3d 1227, 1234 (11th Cir. 2005) (citing <u>Prof'l Real Estate Investors</u>, 508 U.S. at 60-61).

A patent holder can also lose <u>Noerr-Pennington</u> immunity and subject itself to antitrust liability by enforcing a patent knowing that it is invalid.  <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (*en banc*). In <u>Walker Process</u>, the Supreme Court held that a patentee could be subject to antitrust liability for attempting to enforce a patent that it knew was obtained by fraud committed on the Patent Office.  <u>Walker Process</u>, 382 U.S. at 174; <u>see</u> <u>also</u> <u>Hydril Co. v. Grant Prideco LP</u>, 474 F.3d 1344 (Fed. Cir. 2007)).  In <u>Handgards, Inc. v. Ethicon, Inc.</u>, 601 F.2d 986 (9th Cir. 1979), the Ninth Circuit expanded the

holding of <u>Walker Process</u> and held that a plaintiff had a basis to assert an antitrust

claim where a patent holder, in bad faith, brought litigation against its competitors

based on a weak and narrow patent with the goal of litigating itself into a

monopoly by litigating out its competition.  Unlike <u>Walker Process</u>, the plaintiff in

<u>Handgards</u> did not argue that the patentee procured the patent by fraud on the

Patent Office.  <u>Id.</u> at 989-990.  The plaintiff simply alleged that the patent holder

acted in bad faith when it filed the lawsuits against its competitors, knowing its

patent was invalid.  <u>Id.</u> at 990-91.  There is no question, even in <u>Handgards</u>, that an

actual enforcement action was a prerequisite to the antitrust claim.

The Eleventh Circuit does not apply <u>Walker Process</u> as expansively as the

Ninth Circuit.  In <u>Valley Drug Co. v. Geneva Pharm., Inc.</u>, 344 F.3d 1294 (11th

Cir. 2003), the Eleventh Circuit considered a settlement agreement in which a

patent holder agreed to pay its competitors to delay the release of their competing

drugs.  <u>Id.</u> at 1300.  The district court found the agreements *per se* unlawful.  <u>Id.</u> at

1295.  The Eleventh Circuit reversed, concluding that the "private antitrust remedy

should not be deemed to reach § 2 monopolies carried on under a nonfraudulently

procured patent."  <u>Id.</u> at 1307 (citing <u>Walker Process</u>, 382 U.S. at 351-52.  The

court noted that "[t]he only time the Supreme Court has addressed the

circumstances under which the patent immunity from antitrust liability can be

pierced, it held that the antitrust claimant must prove that the patentee enforced a patent with the knowledge that the patent was procured by fraud on the Patent Office." Id. (citing Walker Process, 382 U.S. at 177); see also Hydril Co., 474 F.3d at 1349-50.  The court cautioned against expanding antitrust liability for asserting patents because "[p]atent litigation is too complex and the result too uncertain for parties to accurately forecast whether enforcing the exclusionary right through [agreement] will expose them to treble damages if the patent immunity were destroyed by the mere invalidity of the patent." Id. at 1308.

### 3.    *Pollard's Original Complaint*

In response to Scientific Games' Motion to Dismiss the Original Complaint, Pollard asked the Court to further expand the Ninth Circuit's opinion in Handgards.  Plaintiff contended that the Ninth Circuit and Federal Circuit "emphasize bad faith as a limiting principle to prevent antitrust suits from chilling the operation of the patent system." (Id. at 14.)  In Pollard's view, those generally acting in bad faith do not deserve the protection of the patent system and that any threat based on a patent believed to be invalid may constitute anticompetitive conduct that can support an antitrust claim if there is some anticompetitive effect. Pollard further argued that "a competitor of a party claiming to have patent rights may assert a cause of action where the party claiming the patent rights has

concluded the patent is not enforceable yet asserts the patent as valid in entering

into agreements with customers." (Id.)

The Court ultimately found that Pollard's "bad-faith licensing" theory of

antitrust liability was not viable because the Original Complaint failed to allege

that Scientific Games had enforced the '991 patent, such as through litigation or a

specific threat of litigation, (id. at 15-16), a requirement that was met in

Handgards. The January 11th Order noted that courts draw the line at some formal

action to coerce or threaten enforcement of an invalid patent. (Id. at 16.) Patent

holders should not be subject to antitrust liability where they did not enforce a

fraudulently procured or knowingly unenforceable patent[12] against a competitor or

a competitor's customer. Otherwise, the potential antitrust liability would erode

the exclusionary authority of patents and create uncertainty in commercial

negotiations. (Id. at 16-17.)

Pollard requested that antitrust liability be expanded to cover the mere

licensing of a patent to a company Pollard sought to do business with, even though

---

[12] The January 11th Order noted that Pollard did not allege that the '991 patent was fraudulently procured. In fact, the only allegation made by Plaintiff is that a lawyer had offered his opinion on the validity of the patent. Pollard simply alleged that at some point in mid-2002, based on this opinion, the Defendants concluded, or formed a belief or otherwise knew that the '991 patent was invalid. Pollard thus alleged that Defendants committed an antitrust violation by subsequently entering into license agreements with state lotteries, even if a court later decided that Defendants' conclusion, belief or knowledge was incorrect. (Id. at 16 n. 9.)

the patent was not fraudulently obtained but was later believed to be invalid.  This

theory was unprecedented and the Court concluded that the chilling impact of such

expanded liability on patent holders would be inestimable, particularly when the

"enforcement" was against those who Pollard sought to do business with, as

opposed to Pollard itself.  (Id. at 19.)

> ### 4.    *Pollard's Bad-Faith Licensing Argument Based on the FAC*

Plaintiff's First Amended Complaint includes some additional factual

allegations, but Pollard still relies on its bad faith licensing theory of antitrust

liability.  Pollard now alleges that SG Int'l, knowing the '991 patent was invalid,

entered into licensing agreements with Pollard that granted Pollard the right to

print lottery tickets covered by the '991 patent for the Connecticut, Ohio, and

Virginia lotteries.  (FAC at ¶¶ 69-70.)  Plaintiff also alleges that SG Int'l entered

into license agreements with six state lotteries granting to them the right "to use,

sell, offer for sale or distribute" tickets covered by the '991 patent.[13]  (Id. at ¶ 87;

see also FAC Exhibit G ¶2.01.)  These six state lotteries, in turn, entered into

sublicenses with Pollard to print the tickets.  (Id.)  The license agreements into

---

[13] The six state lotteries include Arizona, California, Georgia, Minnesota, New York, and Texas.  (FAC ¶ 87.)  Pollard also alleges that Scientific Games "asserted" the '991 patent against other state lotteries, including Connecticut, Indiana, Iowa, Ohio, Oregon, and Wisconsin.  (FAC ¶ 67.)  The Complaint does not specify how Scientific Games "asserted" the '991 patent against these additional state lotteries.

which Defendants entered with Pollard and the state lotteries provide that Defendants retain the exclusive right to sue for infringement, (id. at ¶¶ 90, 95), that ticket printers must mark the tickets with the '991 patent number, (id. at ¶¶ 73, 79, 84, 102), and that lotteries and printers must cease and desist practicing the '991 patent upon expiration of the licenses.  (Id. at ¶¶ 76, 81, 86, 89, 94, 103.)

SG Int'l and SG Canada moved to dismiss the FAC asserting again that, even with the additional facts alleged, Pollard has failed to allege sufficient enforcement of the patent to support an antitrust claim.  The Court agrees.

Pollard has failed to allege that Scientific Games "enforced" the '991 patent and, absent enforcement conduct, Pollard has not alleged conduct that violates the antitrust laws.  See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1357-58 (Fed. Cir. 2004) ("a Walker Process claim is premised upon *the enforcement* of a patent procured by fraud on the Patent Office.") (emphasis in original), *rev'd on other grounds* 546 U.S. 394 (2006).  The Federal Circuit has consistently held that "the standards that we have developed for determining jurisdiction in a Declaratory Judgment Action of patent invalidity also define the minimum level of 'enforcement' necessary to expose the patentee to" antitrust liability.  Hydril Co, 474 F.3d at 1350.  To determine jurisdiction in a declaratory judgment action, courts look to whether "the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

The licensing of a non-fraudulently procured patent, without more, does not amount to enforcement sufficient to permit antitrust liability against the patent holder. Phillips Plastics Corp v. Kato Hatsujuo Kabushiki Kaisha, 57 F.3d 1051, 1053-54 (Fed. Cir. 1995) ("The offer of a patent license does not create an actual controversy."); Christopher R. Leslie, Patent of Damocles, 83 Ind. L.J. 133, 155 (2008) ("licensing activity does not currently qualify as enforcement for Walker Process purposes."); see Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888-89 (Fed. Cir. 1992). Courts look to particular statements and conduct during the licensing negotiations to determine whether antitrust liability arises. See Hydril Co., 474 F.3d at 1347 (complaint alleging that a cease-and-desist letter "was intended and understood to be a threat . . . to refrain from sales . . . ."); Elecs. for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1346 (Fed. Cir. 2005) ("persistent and forceful threats of patent infringement"); Sony Elecs., Inc. v. Guardian Media Techs., Ltd., 497 F.3d 1271, 1282 (Fed. Cir. 2007) (finding declaratory judgment jurisdiction where the patentee presented claim charts showing its competitors' products infringed).

The FAC does not allege that Defendants threatened to enforce the '991

patent against Pollard or Pollard's customers.  Plaintiff elects instead to imply a

threat of litigation from the fact of the license and the license terms.[14]  Pollard's

implied-threat theory rests on these facts about the license agreements that

Defendants negotiated:  (1) that Scientific Games retained the exclusive right to

sue for infringement; (2) that the printers mark the '991 patent number on the

tickets; and (3) that licensees stop practicing the patent upon the expiration of the

---

[14] Pollard alleges in its brief that "Scientific Games 'widely publicized' the '991 patent across the relevant market, and it 'directed communications to particular industry participants suggesting that [it] would act aggressively to challenge activities that it saw as potentially infringing.'"  (Pl's Br. [46] at 4 (citing Hydril Co. v. Grant Prideco LP, 474 F.3d 1344 (Fed. Cir. 2007)).  The Court notes that the FAC does not allege facts to support that Scientific Games "widely publicized" the '991 patent or that it suggested that it would act aggressively to challenge potentially infringing activities.  In Hydril, the Federal Circuit permitted the plaintiff to proceed with its Walker-Process claim against a patent holder where the patent holder threatened litigation against the plaintiff's customers by sending a letter that "was intended and understood to be a threat" to refrain from sales of a product Hydril contended infringed its patent.  Id. at 1347.  The FAC does not allege similar enforcement activities in this case and Hydril does not apply.  Importantly, the patent Hydril asserted was "obtained by fraud on the Patent and Trademark Office."  Id. at 1345.  That the patent was fraudulently obtained brings Hydril within the heartland of those limited antitrust actions allowed under Walker Process—cases which threatened enforcement of patents fraudulently procured.  Pollard here does not allege that the '991 patent was fraudulently obtained.

license.[15]  These terms are, however, common in licensing agreements.  They are

not, alone or in combination, threats of litigation or enforcement activity.[16]

Scientific Games' licensing of the '991 patent to Pollard for Connecticut,

Ohio, and Virginia also is not a threat of litigation.[17]  (Pl's Br. [46] at 5.)  Pollard

does not allege that Scientific Games threatened an action against Pollard or these

states for infringing the '991 patent if a license agreement was not reached.  As the

Court already has noted, it is well established that merely entering, or requesting to

enter, into a license agreement does not constitute enforcement activity for antitrust

purposes.  See Phillips Plastics Corp., 57 F.3d at 1053-54 ("a patentee's attempt to

conduct license negotiations is a commercial activity [and does] not create a

---

[15] Pollard does not explain how these provisions constitute threatened enforcement and it has not provided any authority that these provisions constitute a threat of litigation.  The Federal Circuit looks to conduct and statements made during licensing negotiations, not the terms of the license, to determine whether there was an actual or implied threat of litigation.  See Phillips Plastics Corp., 57 F.3d at 1053-54; Shell Oil Co., 970 F.2d at 888-89.

[16] Retaining the right to sue for infringement allows the patent holder, not its licensees, to decide whether to sue for infringement and risk an attack on the validity of the patent.  Marking a patent number on a product provides notice to potential infringers, which can lead to increased damages in an infringement action.  It is common sense to require the licensee to stop practicing the patent upon the license expiration.

[17] Pollard also argues that litigation threats against its customers amount to enforcement under Section 2.  The Federal Circuit has found that, in certain circumstances, litigation threats against a plaintiff's customers may give rise to an antitrust claim.  In those cases, however, the threat of litigation was clear.  Hydril Co. v. Grant Prideco LP, 474 F.3d 1344 (Fed. Cir. 2007).  Pollard has failed to allege that Scientific Games made threats to its customers.

justiciable controversy."); <u>Shell Oil Co.</u>, 970 F.2d at 888-89 (same).  A belief that the keyless validation instant-win scratch tickets sold by the lotteries fell within the '991 patent and a later request for a license simply does not constitute an implicit threat of litigation.[18]

The overwhelming majority of Federal Circuit cases also suggest that a license itself does not constitute enforcement of a patent.  These cases, rather, focus on whether actions and statements made during license negotiations, such as threats of possible litigation, may constitute actionable enforcement activity.  For example, in <u>Shell Oil Co. v. Amoco Corp.</u>, 970 F.2d 885 (Fed. Cir. 1992), Shell sought a declaratory judgment that its new oil-catalyst product did not infringe the patent of its competitor, Amoco.  Prior to bringing the catalyst to market, Shell attempted to negotiate a license with Amoco in which it required Amoco to agree not to assert the patent against Shell if Shell paid Amoco a fee.  <u>Id.</u> at 886.  During the course of the negotiations, Amoco made several comments to the effect that Shell's oil-catalyst would infringe its patent.  Specifically, Amoco stated that: (1) Shell's catalyst fell within the Amoco patent; (2) under certain circumstances, the

---

[18] If Pollard's implied threat by licensing theory were viable, every license agreement would necessarily constitute a threat of litigation when a lawyer offered a legal opinion that a patent may not be valid.  This is exactly the kind of uncertainty and erosion of the exclusive rights a patent provides that our circuit sought to prevent in <u>Valley Drug</u>.

catalyst would infringe; (3) the claims of the patent may be read to cover the catalyst; and (4) the catalyst may be covered under the patent. Id. at 886-87.  The negotiations with Amoco were unsuccessful, and Shell brought an action seeking a declaration that its catalyst did not infringe the Amoco patent. Id. at 887.

The Federal Circuit concluded that none of Amoco's statements amounted to an express charge of infringement and that it would have to "look to the totality of the circumstances to determine if an actual controversy exists." Id. at 888.  The court looked at the context of the statements and noted that Amoco did not take any action against Shell, did not engage in any conduct constituting assertion the patent, and did not issue to Shell threats. Id. at 889.  Because "Amoco's statements to Shell, in the context in which they arose, were not threats to sue," the Federal Circuit concluded that there it did not have declaratory judgment jurisdiction. Id. at 889.

The Federal Circuit decided Shell Oil under the pre-MedImmune standard for determining declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).  The MedImmune decision "lowered the bar for determining declaratory judgment jurisdiction  . . . in the licensor-licensee context," Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1361-62 (Fed. Cir. 2009), but it did not change the principle that, in the absence of an express charge of infringement,

courts must look to the totality of circumstances to determine if declaratory judgment jurisdiction exists.  Pollard has failed to allege that Defendants expressly or implicitly threatened litigation and it has not alleged facts showing that, under the totality of the circumstances, Defendants threatened to enforce the '991 patent against state lotteries, Pollard, or any other person.

The FAC does not assert any additional allegations that Defendants enforced the '991 patent.  Pollard does not allege that Defendants threatened to sue potential infringers or that Defendants claimed that a refusal to enter into a license agreement would constitute infringement if scratch-off tickets were manufactured and sold.  The FAC simply asserts the conclusion that "SG Int'l has enforced the '991 patent against Pollard and state lotteries evidenced by the numerous license agreements that SG Int'l has entered into with Pollard (and the statements made during negotiations therefore) and with state lotteries as discussed below in paragraphs 67-105."  (FAC ¶ 63.)  The fact that SG Int'l entered into licensing agreements regarding the '991 patent does not constitute enforcement of the '991 patent.[19]  Pollard does not allege any statements—threatening or otherwise—that Defendants made "during negotiations."

---

[19] Pollard cryptically refers to "statements made during negotiations" as facts to suggest that Scientific Games threatened enforcement during negotiations.  (FAC ¶ 63.)  The FAC does specify what these statements were and without more detailed

In its January 11th Order, the Court allowed Pollard to amend its complaint to provide sufficient facts that Scientific Games enforced or threatened to enforce the '991 patent against either Pollard or its customers.  (Jan. 11th Order [40] at 15). Pollard has failed to allege facts to support that Defendants enforced or threatened to enforce the patent.  Instead, it has relied on faulty syllogistic logic based on premises not recognized in antitrust jurisprudence.  In the absence of an allegation that the '991 patent was procured by fraud, a patent holder will not be put at risk of an antitrust claim if at some later time the patent holder may represent—indeed may even believe—the patent is unenforceable.  To adopt a rule that degrades the value of a patent based on some later acquired belief of patent invalidity would erode the exclusionary power of the patent.  A brighter-line test is required.  In the absence of some actual, discernable act, threat of an act, or negotiation statement to assert a threat of patent enforcement, an antitrust claim cannot be asserted.  The FAC does not allege a cognizable antitrust claim and the Court is required to dismiss the antitrust action in this case.[20]

---

allegations, the Court simply cannot determine whether these unspecified statements constitute enforcement of the '991 patent.  See Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1333 (11th Cir. 2010) ("the complaint must contain more than labels and conclusions").

[20] Scientific Games argues that the FAC fails to properly allege (1) a plausible product or geographic market, (2) market power, and (3) harm to competition. Because the Court has concluded that Pollard's antitrust claim fails for lack of

C.     Pollard's Declaratory Judgment Claim

The Court concluded in its January 11th Order that because Scientific Games only enforced the '991 patent against the state lotteries, as opposed to Pollard directly, Scientific Games' conduct did not "constitute a substantial controversy of sufficient immediacy and reality between Pollard and Scientific Games for the Court to exercise subject matter jurisdiction over Pollard in this declaratory judgment action."  (Jan. 11th Order at 30.)  The Court granted Scientific Games' motion to dismiss and did not authorize Pollard to amend its declaratory judgment claim.  (Id. at 30-31.)

The FAC realleged the declaratory judgment claim and made inconsequential changes to it to update references to previous paragraphs of the complaint, which were necessary in light of Pollard's addition of several new paragraphs relating to its antitrust claim.  Pollard clarified in its brief that it understands that the Court dismissed its Declaratory Judgment claim and it does not request the Court to revisit it in this order.

---

standing and its failure to allege that Scientific Games enforced the '991 patent, the Court does not address again its conclusion that Plaintiff failed to allege sufficient relevant product or geographic markets and antitrust harm.

D.    Pollard's Claim for Attorneys' Fees

Plaintiff's FAC seeks attorneys' fees under 35 U.S.C. § 285 for Scientific

Games' alleged violation of Section 2 of the Sherman Act.  (FAC ¶¶ 128-130.)

Having concluded that Pollard's antitrust claims are required to be dismissed, the

Court also dismisses Pollard's claims for attorneys' fees.

## III.   CONCLUSION

For the foregoing reasons, Pollard's First Amended Complaint is required to

be dismissed.  Having allowed Pollard a previous opportunity to amend its

complaint, a further amendment is not permitted and Pollard's claims are

dismissed with prejudice.  Accordingly,

**IT IS HEREBY ORDERED** that Defendants Scientific Games

International, Inc., and Scientific Games Products' (Canada) Motion to Dismiss

[43] is **GRANTED**.


**SO ORDERED** this 19th day of July, 2011.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE